# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| PATRICIA PERRY, | : | |
| Plaintiff, | : | |
| | | Case No. 3:14cv00122 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

Plaintiff Patricia Perry brings this case pro se challenging the Social Security Administration's denial of her application for Disability Insurance Benefits. She asserts here, as she did before the administration, that she has been under a benefits-qualifying disability – starting on August 22, 2010 – due to various health problems including, but not limited to, chronic obstructive pulmonary disease, liver disease, and depression.

The case is presently before the Court upon Plaintiff's Response to a Show Cause Order and Statement of Errors (Doc. #s 9, 11), the Commissioner's Memorandum in Opposition (Doc. #12), the administrative record (Doc. #7), and the record as a whole.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

## II. Background

### A. Plaintiff and Her Testimony

Plaintiff was 49 years old on her alleged disability onset date, placing her in the category of a "younger person" for purposes of resolving her claim for Disability Insurance Benefits.  *See* 20 C.F.R. § 404.1563(c).  When she turned age 50, she entered the category of a "person closely approaching advanced age."  *Id*. at §404.1563(d).  She has at least a high-school education.  Her past relevant employment includes work as hair stylist since the 1980s.  (Doc. #7, *PageID#* 273).

In a functional report Plaintiff completed for the Social Security Administration, she was asked to indicate how her health conditions limit her ability to work.  She wrote:

> I have severe asthma.  And I have COPD.  I cannot breath[e] very well and have to have my oxygen on several times a day.  To leave the house I have to make sure I take my tank with me, and [have] someone to carry it.  I also have emphysema.

*Id*. at 276.

At her hearing before Administrative Law Judge Curt Marceille, Plaintiff was represented by an attorney.  Plaintiff testified that she stopped working in August 2010 when her employment was terminated.  She explained that her employer "said that I didn't perform some work that I was supposed to do."  *Id*. at 119.

Plaintiff went on unemployment compensation and began looking for another job as a hairstylist as well as other possible jobs.  She did not find a job.  The administrative law judge asked Plaintiff, "Now if you had been hired at another hair store would you have been

2

able to do the job?" *Id*. at 121.  Plaintiff answered, "I believe I could have at that time, as long as I was given sufficient breaks, because I started getting more tired and more tired, harder breathing and stuff.  At least part-time I could have, I think." *Id*.

Plaintiff further testified, "[T]he whole time I was on unemployment I did go seek work, but carrying the oxygen machine when you go and see several different places, I tried to leave it in the car because of looks ... you know, but..., I really just can't stand all that long and it would be hard to take a job cutting hair and sit down after every haircut, they really don't look to[o] good upon that." *Id*. at 131-32.

Plaintiff stated that the primary reason she cannot work is her breathing problems.  She explained, "It's hard for me to get around; it's hard for me to stand for that long.  I have to take a lot of breaks, I have to sit down.  It's hard for me to shop; it's hard for me to be on my feet for long periods of time." *Id*.  She has carried oxygen with her since January 2011:

> I have it in the car every day in case I need it, but I try to leave it in the car if I can, but if I'm going to be ... anywhere an extended time I take it with me, but I have it in the car with me, but it is heavy and cumbersome, so if I, you know, I have it with me at all times, but because of the weight of it and bulkiness of me being able to carry it, you know, it's not always on my person, but it's within a few feet of me.

(Doc. #7, *PageID#* 122).  Plaintiff estimated that she uses the oxygen machine 50% of the day.  At night, she uses it for 2 hours before she goes to bed. *Id*. at 132-33.

Plaintiff uses inhalers every day: 1 in the morning, the other at night.  She also uses a "rescue inhaler" as needed, at least once or twice, during the day. *Id*. at 129.

Plaintiff and her husband travel to visit her husband's parents.  This occurs 1 to 2

3

times per month.  Plaintiff usually accompanies her husband on these trips and she characterized herself as his "sleeping traveler."  *Id*.

Plaintiff is able to lift 10 pounds but cannot lift her 2-year-old grandbaby.  Plaintiff can stand about 20 to 30 minutes.  She takes medication daily for depression, and she takes anxiety medication but not every day.  The medications help and do not cause her side effects.  When asked if she felt she had any limitations or problems because of a mental issue, Plaintiff testified, "No. I've been taking those [medications] for years."  *Id*. at 131.

Plaintiff can drive.  She goes to the grocery store twice a week or she will visit a friend or go to a movie.  She does not do a full grocery shop at one time; she sends her husband instead.  She noted, "I'll go and pick up, like, milk, and bread, and eggs and then go home because of being away from the oxygen ...."  (Doc. #7, *PageID#* 132).  She lives in a one-floor ranch house with a basement.  She cannot use the stairs, so her husband does the laundry, and he carries it from the basement to the first floor where Plaintiff folds it.

When asked if she smokes cigarettes, Plaintiff answered, "No."  *Id*. at 123.  She had quit about 2 weeks before the ALJ's hearing.  *Id*.  Plaintiff cooks about 3 times per week.  She watches TV during the day and visits with her husband when he comes home for lunch.  She takes a nap in the afternoon then watches a movie.  After eating dinner, she watches a TV show, then goes to bed.  Her husband does the vacuuming and takes out the trash.  Plaintiff washes the dishes.  She scrubs the bathroom about once every 3 weeks.  She cleans the cat box.

    **B.**     **Medical Evidence**

A detailed summary of the medical evidence is unnecessary because the undersigned has reviewed the entire administrative record and because the ALJ accurately referred to the relevant records with citations to specific evidence. The pertinent medical evidence will be discussed below.

**III.**     **The "Disability" Requirement,
The Regulations, And The ALJ's Decision**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security lexicon.[2] 42 U.S.C. § 423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review considers and answers five

---

[2] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

5

questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's "residual functional capacity," can the claimant perform his or her past relevant work? The claimant's residual functional capacity is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.[3]

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

20 C.F.R. § 404.1520(a)(4); *see Colvin*, 475 F.3d at 730; *see also Foster v. Halter*, 279 F.3d 348, 354 (6th Cir.2001).

In the present case, ALJ Marceille found the following at each sequential step:

1. Plaintiff had not engaged in substantial gainful activity after her asserted disability began.

2. Plaintiff had the severe impairments of "degenerative disc disease of the lumbar spine, moderate asthma/chronic obstructive pulmonary disease; and liver disease (hepatitis C) by history." (Doc #7, *PageID#* 103).

3. Plaintiff's impairments or combination of impairments did not meet or equal the criteria in the Commissioner's Listing of Impairments, including Listings. *Id*. at 77-80.

---

[3] 20 C.F.R. §404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

6

4. Plaintiff retained the residual functional capacity[4] to perform a limited amount of light work, but "[s]he does not retain the capacity to climb ladders, ropes, scaffolds, ramps, or stairs at all. She is able to balance without limitation, stoop, kneel, crouch, or crawl occasionally. She should avoid concentrated exposure to extremes of hear, cold, humidity, and wetness. The claimant's asthma requires her to avoid even moderate exposure to pulmonary irritants." *Id*. at 105. And, Plaintiff could perform her past relevant work as a hair stylist. *Id*. at 109.

5. Plaintiff could make a successful adjustment to other jobs that exist in significant numbers in the national economy. *Id*. 110-11.

The sum and substance of the ALJ's sequential evaluation ultimately led the ALJ to conclude that Plaintiff was not under a benefits-qualifying disability.

## IV. <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a

---

[4] A social-security claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. § 404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . " *Rogers*, 486 F.3d at 241; *see Gentry*, 741 F.3d at 722.

The second line of judicial inquiry – reviewing the ALJ's legal criteria for correctness – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting, in part, *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.     Discussion

Plaintiff argues that the ALJ's decision contains numerous misquotes and key omissions. She challenges the ALJ's reasons for not fully crediting her testimony about her daily need to carry and use supplemental oxygen. She also challenges the ALJ's findings regarding her trips to visit her ex-husband's parents, her continued cigarette smoking and alcohol consumption, her twice weekly shopping trips, her failure to regularly see a doctor for her liver problems, her daily activities, and the reason she was fired from her last job.

Reviewing the ALJ's decision for legal error reveals none. The ALJ correctly

8

described the legal criteria applicable at each step of the sequential evaluation. (Doc. #7, *PageID*#s 102-03). At step 1, the ALJ made findings favorable to Plaintiff, noting that she meets the insured status required for Disability Insurance Benefits through December 31, 2015, and that she had not engaged in any meaningful paid work (substantial gainful activity) after her asserted disability onset date. *Id.* at 103. The ALJ's finding at step 2 that Plaintiff had several severe impairments also favored her. *Id.* Although the ALJ found at step 3 that Plaintiff did not have an impairment that meets or equals one in the Commissioner's Listing of Impairments, the ALJ supported this conclusion with specific reasons and citations to evidence of record. No error is present here, and Plaintiff's arguments do not point to a problem or error in the ALJ's step 3 discussion or conclusion.

      Plaintiff's arguments focus on the ALJ's findings at step 4 where he evaluated her credibility. A person's statements about her "pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. §404.1529(a). The record must contain objective medical evidence of an underlying medical condition. When such evidence exists, the inquiry asks (1) whether the objective evidence confirms the severity of the claimant's pain or other symptoms, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged pain or other symptoms. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citations omitted). In some situations, a person's symptoms "suggest a greater severity than can be shown by objective medical evidence alone ...." 20 C.F.R. §404.1529(c)(3). If this occurs,

9

ALJs consider other factors, including for example, the person's daily activities; the location, duration, and intensity of pain or other symptoms; precipitating and aggravating factors; and the effectiveness and side effects of medications. *Id.*; *see Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters*, 127 F.3d at 531. "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. However, the ALJ is not free to make credibility determinations based solely upon an "'intangible or intuitive notion about an individual's credibility.'" *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (internal citations omitted). Substantial evidence must support the ALJ's reasons for discounting the applicant's statements. *See id*. at 248-49.

In the present case, the ALJ described the correct legal criteria applicable under the Social Security Administration's credibility regulations. *See* 20 C.F.R. §404.1529; *see also* Doc. #7, *PageID#* 105-06. The ALJ then engaged in a detailed discussion of the evidence. Substantial evidence supports the ALJ's main credibility findings. As the ALJ discussed, clinical and objective findings routinely revealed unremarkable results. Plaintiff went to the hospital on August 23, 2010 and was diagnosed with acute gastroenteritis. Her lungs were "clear to auscultation bilaterally without wheeze or rales." (Doc. #7, *PageID#* 346). Her

asthma was stable. *Id*. Although Plaintiff went to the hospital in January 2011 with acute asthma/COPD, a chest x-ray showed "pulmonary vasculature ware unremarkable. Lungs are well expanded and free of acute infiltration. Pleural spaces are clear...." *Id*. at 370. Records of a physical examination on March 3, 2011 state, "Lungs revealed symmetrical and full clear breath sounds. There was no wheezing or rales...." *Id*. at 374. Dr. Danopolus performed pulmonary function testing in June 2011, which revealed "moderate degree of obstructive lung disease ..." *Id*. at 393. In August 2011, examination of Plaintiff's lungs "revealed some diffuse expiratory wheezes, but no diminished breath sounds." *Id*. at 422.

In October 2011, Plaintiff's treating physician, Dr. Bedel, answered written interrogatories. He had not seen Plaintiff since March 2011. He noted, "continues to smoke AMA [against medical advice]," "no obvious impairment noted," and "needs PFT [pulmonary function testing]." *Id*. at 406.

Plaintiff underwent chest x-rays in February 2012, indicating that while she had bronchitis, her lungs were free of infiltrates and were well inflated. *Id*. at 425. On July 11, 2012, a physical exam found no respiratory distress and her lungs were clear to auscultation. *Id*. at 434. On July 26, 2012, a pulmonary/chest exam revealed, "Effort Normal. No stridor.[5] No respiratory distress. She has no rales. She exhibits no tenderness." *Id*. at 430. On October 8, 2012, pulmonary/chest examination revealed, "Effort Normal. No stridor. No respiratory distress. She has no rales. She exhibits no tenderness." *Id*. at 427 (footnote

---

[5] "Stridor" is a "high-pitched, harsh sound occurring during inspiration .... It is a sign of upper airway obstruction ...." TABER'S CYCLOPEDIC MEDICAL DICTIONARY at 1981 (19th ed. 2001).

added).

Based on the above records, it was reasonable for the ALJ to conclude that when Plaintiff complied with her medication, her symptoms subsided. The ALJ was not obliged to accept all of Plaintiff's testimony, and his decision to not fully credit her explanations of her limited daily activities and other inabilities was not an error of law. This is especially so because even though her medical records establish that Plaintiff suffers from chronic breathing difficulties, liver problems, and other health problems, the medical records repeatedly confirm the absence of serious symptoms or difficulties breathing. "The absence of sufficient medical evidence makes credibility a particularly relevant issue, and in such circumstances, this court will generally defer to the Commissioner's assessment when it is supported by an adequate basis." *Walters,* 127 F.3d at 521 (citation omitted). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id*. Here, because medical records frequently document a lack of respiratory or other symptoms, it was appropriate for the ALJ to discount Plaintiff's explanations of her symptoms and limitations. *Cf. Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 543 (6th Cir. 2007) (ALJ affirmed regarding credibility: "the record is replete with medical evidence that Cruse's symptoms were not as severe as she suggested.").

Plaintiff's assertion that the ALJ erred by finding that she was terminated from her last job for a reason other than a disability lacks merit. The record does not conclusively

12

establish a single reason for the termination of her employment.  Instead, two possible reasons emerge: (1) her employer's stated reason for her termination (slow customer service); or (2) her belief that her employer's stated reason covered up the real reason she was terminated (absenteeism due to illnesses).  Faced with these 2 possibilities, and lacking probative evidence confirming either reasonable possibility, the ALJ's acceptance of the first, non-disability reason was within his zone of choice.  *See Blakley*, 581 F.3d 406 ("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").  In addition, the ALJ recognized that Plaintiff "chose to file for unemployment benefits from the end of 2010 through the fourth quarter of 2011.  Of course, this required her to apply for several hair stylist and gas station jobs." (Doc. #7, *PageID*# 107).  This was a reasonable basis to discount Plaintiff's credibility because unemployment benefits "are conditioned on the unemployed beneficiary's being able to work." *Justice v. Comm'r Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013).

Plaintiff expresses frustration with the fact that she has paid into the Disability Insurance Benefits program for many years as a member of the workforce but the Social Security Administration has failed to honor its promise of payment when she has become unable to work. (Doc. #470).  She notes, "I am not asking for a hand out, only that the SSA be held accountable for the insurance payments I made to them.  They should be required by the same laws they use to collect money to in turn pay it rather than hide behind lawyers and

13

the courts to deny people of good faith any return on the investment...." *Id*. At best for Plaintiff, these heartfelt arguments challenge the policy Congress and the Social Security Administration has implemented when establishing the Disability Insurance Benefits program and statutes and regulations regarding who is, and who is not, eligible to receive benefits. Those laws place the burden on Plaintiff to establish her eligibility for benefits. *See* 42 U.S.C. §423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability ...."). This Court's review of the Administrative Law Judge's decision is likewise limited, most notably by the substantial-evidence standard. This means that even if the Court disagrees with an ALJ's factual findings, as long as the ALJ applied the correct legal criteria and substantial evidence supports the ALJ's conclusions, the administrative decision must be upheld. *Blakley*, 581 F.3d at 406. The courts, moreover, apply this standard of review with focused attention on the evidence presented in each case. Examples of this are many, with some decisions favoring plaintiffs and others favoring the Commissioner. *See, e.g., Rogers*, 486 F.3d 234; *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994); *Walters*, 127 F.3d 525. In the present case, although there is no doubt that Plaintiff suffers from many significant health problems and that she paid into the Disability Insurance Benefits program for many years, the ALJ's non-disability decision must be upheld because he applied the correct legal

criteria and substantial evidence supports his findings.

## IT IS THEREFORE RECOMMENDED THAT:

1. The ALJ's non-disability decision be affirmed; and

2. The case be terminated on the Court's docket.


June 17, 2015

                                                 s/Sharon L. Ovington
                                                 Sharon L. Ovington
                                    Chief United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).